## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 8:05CR113 |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | RECOMMENDATION |
| TIMOTHY W. WASHINGTON, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the motion of defendant Timothy W. Washington (Washington) to suppress (Filing No. 15). Washington seeks to suppress any evidence seized from Washington as a result of a traffic stop on March 2, 2005, and any subsequent questioning conducted by officers of the Omaha Police Department (OPD) on March 2, 2005. Washington is charged in Count I of the Indictment with the possession of a firearm after Washington had been convicted of a felony in violation of 18 U.S.C. § 922(g).

An evidentiary hearing was held on the motion on May 24, 2005. At the hearing, the court heard testimony from OPD Officer Scott Antoniak (Officer Antoniak) and James A. Hall (Mr. Hall), an investigator with the Office of the Federal Public Defender. The court also received into evidence several street diagrams (Exhibits 1 and 2), and three photographs of an automobile (Exhibits 101-103). A transcript of the hearing (TR.) was prepared and filed on June 1, 2005 (Filing No. 26). The government and Washington submitted post-hearing briefs on June 8, 2005 (Filing Nos. 27 and 28).

### FINDINGS OF FACT

On March 2, 2005, Officer Antoniak was assigned to the northeast precinct in Omaha and was working the four to midnight shift (TR. 6-7). Officer Antoniak was in uniform, in a marked OPD patrol cruiser, and partnered with OPD officer Steve Hogle (Officer Hogle) (TR. 7). Officer Hogle was driving and Officer Antoniak occupied the front passenger seat (TR. 9). At approximately 5:30 p.m. on March 2, 2005, Officers Antoniak and Hogle were southbound

on 40th Street after turning off Lake Street in Omaha (TR. 9). This area of 40th Street is a residential area and the street is two lanes, one northbound and one southbound (TR. 10). The weather was sunny and clear, the road conditions were dry, and the speed limit for the area was thirty-five miles per hour (TR. 10). Once the officers turned south on 40th Street, they observed a '93 Buick Regal in front of them with a cracked windshield (TR. 10-11). The officers were about two car lengths behind the Buick with no intervening traffic or obstructions (TR. 11). The Buick was traveling within the posted speed limit (TR. 11). Officer Antoniak testified he could observe "there was a crack in the windshield that went all the way across the windshield at about eye level with little spider veins that come off the main crack" (TR. 11-12). The rear windshield of the Buick was untinted, and due to the setting sun hitting the crack, Officer Antoniak testified the broken glass gave off a prism effect of different colors (TR. 12). Officer Antoniak further described the crack as follows: "It was going horizontal across the windshield, you know, not exactly in a straight line as cracks, you know, will curve and what off, and there's little spider veins coming off the main crack." (TR. 32). Further, Officer Antoniak described the main crack as going from one side of the windshield horizontally midway in the windshield with spiders veins coming off the main parallel crack (TR. 33). The officers followed the Buick southbound on 40th Street and ended up making a traffic stop at 40th and Seward Streets (TR. 12). Prior to the actual traffic stop and after observing the cracked windshield, the officers decided to make the traffic stop for a cracked windshield (TR. 13-14). Immediately prior to the stop, the officers radioed in the license plate of the Buick to determine if the plates belonged to the Buick or whether the Buick was stolen (TR. 14). When the report came back that there was no stolen report and the license plates were proper, Officer Hogle engaged the police cruiser's emergency lights to start the traffic stop (TR. 14). The Buick stopped immediately as the Buick turned onto Seward Street (TR. 15). Seward Street in that area was residential and a two-lane street, one eastbound and one westbound (TR. 13).

After the vehicles stopped, Officer Hogle approached the driver's side of the Buick and Officer Antoniak approached the passenger side of the Buick (TR. 23). Officer Hogle obtained the normal documents from the driver, and both officers returned to the police cruiser to run data checks on the information obtained (TR. 24). The driver was Kevin Wynn and the

data check came back that Wynn was a suspended driver for a violation of a support order (TR. 24). Thereafter, both officers got out of the police cruiser and again walked to the Buick, Officer Hogle to the driver's side and Officer Antoniak to the passenger side (TR. 24). Officer Hogle asked Wynn to step out of the Buick and placed Wynn in handcuffs (TR. 24). Officer Hogle asked Wynn whether there was anything on his person or in the vehicle that the officers should know about such as drugs, guns, needles or knives (TR. 24). Apparently receiving a negative response, Officer Hogle patted down Wynn and then escorted Wynn to the rear of the Buick and in front of the police cruiser (TR. 25). Officer Antoniak asked the passenger, Washington, to step out of the Buick and place his hands on the hood of the Buick (TR. 25). Officer Antoniak asked Washington if there was anything on Washington's person or in the vehicle that the officers should know about, such as drugs, guns, needles or knives (TR. 25). Washington responded in the negative (TR. 25). Officer Antoniak did a quick pat-down of Washington, found nothing, and asked Washington to step to the rear of the Buick (TR. 26). Washington was not handcuffed (TR. 26). Washington was standing about eight feet way from Wynn near the front of the police cruiser and in the rear of the Buick (TR. 27). There was light traffic in the area that day and there were no loud disturbing noises (TR. 28).

With Officer Hogle standing with Wynn and Washington, Officer Antoniak began a search of the interior compartment of the Buick, beginning at the passenger side (TR. 28). Under the passenger seat Officer Antoniak observed a silver handgun at which point he stood erect and gave a silent hand signal to his partner, Officer Hogle, that a firearm had been located (TR. 28). Thereupon, Officer Hogle placed Washington in handcuffs (TR. 30). The handgun was a .22 caliber revolver which was loaded with one cartridge in the chamber (TR. 29). Officer Antoniak cleared the weapon and walked back toward Wynn and asked why Wynn did not tell the officers that the gun was in the Buick (TR. 29). Officer Antoniak asked Wynn if the gun was his and Washington blurted out "it's mine and I carry it for protection" (TR. 29). When Officer Antoniak asked Wynn the question about the gun, Officer Antoniak was facing Wynn with Officer Antoniak's back turned toward Washington (TR. 30). Washington was then arrested and placed in the police cruiser (TR. 31). Wynn was cited for the misdemeanor of driving under suspension and released (TR. 31).

Officer Antoniak testified he had cited individuals in about a hundred cases over his three and half year career as an Omaha police officer for the offense of having a cracked windshield (TR. 5-6). However, Officer Antoniak could not cite the statute prohibiting having a cracked windshield except for vision obstruction (TR. 6).

Mr. Hall testified that he took photographs, Exhibits 101-103, of a vehicle reported to him to be the Buick driven by Wynn on March 2, 2005. The photographs depicted a crack in the left portion of the windshield but did not depict a crack along the entire middle of the windshield.

While there may be a dispute as to the extent of the crack in the windshield in the Buick in issue, the court credits Officer Antoniak's testimony that he believed he observed a crack in the windshield and that such crack was sufficient to obstruct the vision of the driver of the Buick.

## LEGAL ANALYSIS

Washington asserts the vehicle in which he was a passenger was illegally stopped and the subsequent search of the vehicle resulting in the discovery of the firearm was illegal. Washington further asserts the statement he made concerning the ownership of the firearm was made during an illegal detention following the illegal traffic stop. Washington urges the suppression of all such evidence.

"[A] police officer who personally observes a traffic violation has probable cause to stop the vehicle." **United States v. $404,905.00 in U.S. Currency**, 182 F.3d 643, 646 (8th Cir. 1999) **citing Pennsylvania v. Mimms**, 434 U.S. 106, 109 (1977). An issue in this case is whether the operation of a motor vehicle with a cracked windshield is a traffic violation under any Nebraska law. The government has not cited to any statute or ordinance to prohibit the operation of a motor vehicle with a cracked windshield and concedes such does not exist. Officer Antoniak testified he had received training in traffic regulations at the Omaha Police Training Academy, had made thousands of traffic stops, and had cited drivers with cracked windshields for violations of vision obstruction (TR. 5). While vision obstruction is referred to under Nebraska law in Section 60-6,256 of the Revised Statutes of Nebraska Annotated,

nowhere in that section nor any other section of the statutes relating to windshields and windows are there specific prohibitions on cracked windshields. Simply put, Officer Antoniak was mistaken as to cracked windshields being a violation of Nebraska traffic laws.

However, the question is not one whether the operator of the Buick was, in fact, violating traffic laws with a cracked windshield, but whether an objectively reasonable police officer could have formed a reasonable suspicion that the operator of the Buick was violating a traffic law.  **United States v. Martin**, 411 F.3d 998, 1001 (8th Cir. 2005).  Even if Officer Antoniak was mistaken, as he was, as to the existence of a traffic violation, "the validity of a stop depends on whether the officer's actions were objectively reasonable in the circumstances, and in mistake cases the question is simply whether the mistake, whether of law or fact, was an objectively reasonable one." **United States v. Smart**, 393 F.3d 767, 770 (8th Cir. 2005).

The court finds Officer Antoniak had a subjective good faith belief that the Buick was violating Nebraska traffic laws as the court finds Officer Antoniak believed he observed a crack in the Buick's windshield sufficient to impair the vision of the driver.  But, regardless of the good faith belief of Officer Antoniak, such subjective belief does not justify a traffic stop under the Fourth Amendment.  However, the court also finds Officer Antoniak's mistake of law to have been objectively reasonable in light of Officer Antoniak's training and past experiences of prior traffic citation cases involving cracked windshields.  It is further reasonable to believe it would be a violation of traffic laws to operate a motor vehicle with a vision obstruction, be it a cracked windshield or a totally obliterated windshield.  The Eighth Circuit has opined that we "should not expect state highway patrolmen to interpret the traffic laws with the subtlety and expertise of a criminal defense attorney." **United States v. Sanders**, 196 F.3d 910, 913 (8th Cir. 1999).

The court finds the traffic stop of the Buick on March 2, 2005, was not a violation of the Fourth Amendment as Officer Anoniak had an objective reasonable belief that a traffic violation had occurred.  Since the stop was proper, the ensuing temporary detention of the driver and passenger was proper.  Contemporaneous with a valid traffic stop, a police officer may detain the motorist while completing a number of routine tasks such as computerized

checks of the vehicle registration, driver's license and criminal history, and the issuing of a citation. ***$404,905.00,*** 182 F.3d at 647; **see also *United States v. Sokolow***, 490 U.S. 1, 7 (1989).  During this investigatory detention, it was learned that the driver, Wynn, was driving under suspension, a violation of law.  Wynn was arrested and placed in handcuffs. Washington does not contest the officers' arrest of Wynn or the search of the passenger compartment of the Buick apart from Washington's assertion that the traffic stop was unconstitutional.  Further, Washington does not dispute his statement that he blurted out to officers concerning his ownership of the firearm found in the Buick apart from his assertion of the unconstitutionality of the traffic stop.  Accordingly, the court will recommend that Washington's motion to suppress be denied.

**IT IS RECOMMENDED TO JUDGE LAURIE SMITH CAMP that:**

Washington's motion to suppress (Filing No. 15) be denied.

## ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation.  Failure to timely appeal or object may constitute a waiver of any objection.  The brief in support of any objection shall be filed at the time of filing such objection.  Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

Dated this 5th day of August, 2005.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge